# EXHIBIT A

SUPREME COURT
OF BRITISH COLUMBIA
VANCOUVER REGISTRY

MAR 09 2026

S=261734

ACTION NO.
VANCOUVER REGISTRY

**IN THE SUPREME COURT OF BRITISH COLUMBIA**

BETWEEN:

MAYA GEBALA, by her litigation guardian CIA EDMONDS, DAHLIA GEBALA by her litigation guardian CIA EDMONDS, and CIA EDMONDS in her personal capacity

PLAINTIFFS

AND:

OPENAI FOUNDATION (F/K/A OPENAI, INC.), OPENAI GROUP PBC, OPENAI GP, LLC, OPENAI OPCO, LLC, AND OPENAI HOLDINGS, LLC

DEFENDANTS

**NOTICE OF CIVIL CLAIM**

**This action has been started by the plaintiffs for the relief set out in Part 2 below.**

If you intend to respond to this action, you or your lawyer must

(a) file a response to civil claim in Form 2 in the above-named registry of this court within the time for response to civil claim described below, and

(b) serve a copy of the filed response to civil claim on the plaintiffs.

If you intend to make a counterclaim, you or your lawyer must

(a) file a response to civil claim in Form 2 and a counterclaim in Form 3 in the above-named registry of this court within the time for response to civil claim described below, and

(b) serve a copy of the filed response to civil claim and counterclaim on the plaintiffs and on any new parties named in the counterclaim.

JUDGMENT MAY BE PRONOUNCED AGAINST YOU IF YOU FAIL to file the response to civil claim within the time for response to civil claim described below.

**Time for response to civil claim**

A response to civil claim must be filed and served on the plaintiffs,

(a) if you reside anywhere in Canada, within 21 days after the date on which a copy of the filed notice of civil claim was served on you,

(b) if you reside in the United States of America, within 35 days after the date on which a copy of the filed notice of civil claim was served on you,

(c) if you reside elsewhere, within 49 days after the date on which a copy of the filed notice of civil claim was served on you, or

(d) if the time for response to civil claim has been set by order of the court, within that time.

## CLAIM OF THE PLAINTIFFS

### Part 1: STATEMENT OF FACTS

#### Nature of Case

1. This case arises from a mass casualty event that occurred on February 10, 2026, in Tumbler Ridge, BC (population approximately 2,400) (the "Tumbler Ridge Mass Shooting") perpetrated by Jesse Van Rootselaar aka Jesse Strang (dob: August 4, 2007) (the "Shooter") and the role ChatGPT and OpenAI played in same.

#### The Parties

*The Plaintiffs*

2. The Plaintiff, Maya Gebala, by her litigation guardian Cia Edmonds, is an infant and has an address for service of 820-980 Howe Street, Vancouver, BC (the "Plaintiff Maya Gebala"). The Plaintiff Maya Gebala was shot three times during the Tumbler Ridge Mass Shooting.

3. The Plaintiff, Dahlia Gebala, by her litigation guardian Cia Edmonds, is an infant and has an address for service of 820-980 Howe Street, Vancouver, BC (the "Plaintiff Dahlia Gebala"). The Plaintiff Dahlia Gebala is the younger sister of the Plaintiff Maya Gebala.

4. The Plaintiff, Cia Edmonds, is the parent of the Plaintiff Maya Gebala and the Plaintiff Dahlia Gebala and has an address for service of 820-980 Howe Street, Vancouver, BC (the "Plaintiff Cia Edmonds"). The Plaintiff Cia Edmonds brings this action on behalf of the Plaintiff Maya Gebala and the Plaintiff Dahlia Gebala as their litigation guardian, and on her own behalf.

*OpenAI*

5. The Defendants OpenAI Foundation (formerly known as OpenAI, Inc.), OpenAI Group PBC, OpenAI GP, LLC, OpenAI OpCo, LLC, and OpenAI Holdings, LLC, (collectively the "OpenAI Defendants" or "OpenAI") consist of a series of interwoven Delaware entities.

6. The OpenAI Defendants, either collectively or individually, are in the business of creating generative artificial intelligence products, which rely on complex algorithms to create human-like content in response to user inputs.

7. The Defendant OpenAI Foundation (formerly known as OpenAI, Inc.) is a corporation formed in Delaware on December 8, 2015, with its principal place of business at 1455 3rd Street, San Francisco, CA 94158.

8. OpenAI Foundation was formed out of OpenAI, Inc. as a result of a corporate restructuring that took place on October 28, 2025. It is responsible for all liabilities which result from any acts or omissions of its predecessor entities. At all times relevant to this action, OpenAI Foundation (formerly known as OpenAI, Inc.) is and was the nonprofit parent entity that owns, controls, governs, and exercises oversight over its for-profit subsidiaries, including OpenAI OpCo, LLC and OpenAI Holdings, LLC.

9. As the governing entity, OpenAI Foundation is and was responsible for defining the organization's safety mission, establishing its risk-management framework, and publishing the official "Model Specifications" that set the policies and requirements applicable to the development and deployment of its artificial-intelligence models. OpenAI Foundation was directly involved in the unlawful conduct alleged herein, and has facilitated and directed the unlawful conduct through its management and direction of the other OpenAI Defendants.

10. The Defendant OpenAI Group PBC is a public benefit corporation formed in Delaware on October 28, 2025, with its principal place of business at 1455 3rd Street, San Francisco, CA 94158. OpenAI Group PBC was formed as part of a corporate restructuring in which OpenAI, Inc.'s for-profit operations were consolidated under this new public benefit corporation. OpenAI Group PBC is the successor to the for-profit entities that designed, approved, deployed, and profited from GPT-4o, as defined below, and it continues to deploy and profit from GPT-4o today.

11. As the successor entity, OpenAI Group PBC is liable for the harm caused by the conduct of its predecessor entities, including but not limited to the predecessor entities known as "OpenAI, LP" and "OpenAI LLC". OpenAI Group PBC was directly involved in the unlawful conduct alleged herein.

12. The Defendant OpenAI GP, LLC is a limited liability company formed in Delaware on September 19, 2018, with its principal place of business at 1455 3rd Street, San Francisco, CA 94158. OpenAI GP, LLC is wholly owned and controlled by OpenAI, Inc. OpenAI GP, LLC has been directly involved in perpetrating the unlawful conduct alleged herein through its direction and control of OpenAI, LP and OpenAI Global, LLC.

13. The Defendant OpenAI OpCo, LLC is a limited liability company formed in Delaware on September 19, 2018, with its principal place of business at 1455 3rd Street, San Francisco, CA 94158. OpenAI OpCo, LLC is a wholly-owned and for-profit subsidiary of OpenAI Foundation (formerly known as OpenAI, Inc.). OpenAI OpCo, LLC managed and operated ChatGPT services to which the Shooter was subscribed, including the infrastructure and systems which GPT-4o was delivered to end users. OpenAI OpCo, LLC was directly involved in the unlawful conduct alleged herein.

14. Defendant OpenAI Holdings, LLC is a limited liability company formed in Delaware on March 17, 2023, with its principal place of business at 1455 3rd Street, San Francisco, CA 94158. OpenAI Holdings, LLC is a for-profit subsidiary within the OpenAI corporate structure. OpenAI Holdings, LLC owns and controls the core intellectual property underlying OpenAI's commercial models, including the GPT-4o model. OpenAI Holdings, LLC was directly involved in the unlawful conduct alleged herein.

15. To the extent that any predecessor corporations not specifically named herein engaged in the business of developing, researching, testing, marketing, supplying, deploying or profiting from the generative artificial intelligence products at issue in this case, one or more of the OpenAI Defendants is responsible for their conduct as the successor. The Plaintiffs expressly retain the right to further particularize their pleadings with respect to predecessor corporations as further information becomes publicly available.

16. The business of each OpenAI Defendant is inextricably interwoven with that of the other for the purposes of developing generative AI products. At all material times, the OpenAI Defendants functioned as an ongoing, organized and continuing business unit sharing common purposes and objectives. In view of the close relationship between the OpenAI Defendants, each is jointly and severally liable for the acts and omissions of the other.

## OpenAI's Development of ChatGPT

*How Generative AI Products Work*

17. Generative AI products are designed to generate content in response to user inputs. These products are powered by complex models that use statistical methods to algorithmically simulate human inference and modes of expression.

18. Each model is created through a "training" process, where the parameters that define a model's behaviour (i.e., how it "predicts" what output to generate) are adjusted through the ingestion and computation of large datasets. During training, the contents of each dataset are copied, and the model extracts expressive information from these copies. Models store the data they are trained on in a compressed or translated form.

19. The capabilities of a generative AI model depend on the type of data used to train it. Models capable of text-to-image generation are trained on sets of images with text captions. Text generation models, such as "large language models" or "LLMs", are trained on written text.

20. Once a model has been trained, it is able to generate convincing simulations of the data it was trained on. A model makes these predictions by first breaking down a user's input into smaller portions, often called "tokens". Tokens are then translated into a sequence of numbers that allow the model to identify their proximity to other parameters, and the patterns and relationships between them. The model uses this information to statistically "predict" an output that is most likely to be responsive, coherent and contextually appropriate relative to the original input.

*OpenAI Charter*

21. At all material times, OpenAI markets and promotes itself to the general public by its "Charter" and mission statement. OpenAI's Charter indicates:

    a. OpenAI's mission is to ensure artificial general intelligence ("AGI") benefits all humanity;

b. The OpenAI Defendants' "primary fiduciary duty is to humanity" and they commit to avoid enabling uses of artificial intelligence or AGI "that harm humanity"; and

c. The OpenAI Defendants are "committed to doing the research required to make AGI safe".

(the "OpenAI Charter")

*Launch of ChatGPT*

22. Since 2019, the OpenAI Defendants have distributed generative AI products based on their own proprietary large language model ("LLM") GPT-N.

23. In or around November 2022, OpenAI released ChatGPT, a consumer-facing chatbot application using GPT-N to communicate with users. In its original form, ChatGPT was marketed as a tool for users to carry out a wide variety of tasks including writing computer programs, composing essays, and answering questions. Users interact with ChatGPT through "conversations" in which a user provides prompts and ChatGPT responds in an anthropomorphized manner.

24. OpenAI developed the LLM powering ChatGPT using three sources of information: (1) publicly available information from the internet, (2) information obtained from third parties who partner with OpenAI, and (3) information that users, human trainers, and researchers provide or generate. Users of ChatGPT can access vast, virtually infinite swaths of information from across various sources and receive that information in a digestible format almost instantaneously.

25. ChatGPT is equipped with a real-time monitoring system which analyzes every user's messages and assigns a probability score across categories including self-harm, violence, and sexual content (the "Monitoring System"). The Monitoring System runs behind every user's conversation and generates detailed data about a user, and examines patterns across entire chat sessions to identify users in crisis by detecting escalating emotional distress, increasing frequency of violent content, and behavioural patterns.

*GPT-4o*

26. In or around spring 2025, OpenAI released an updated version of ChatGPT powered by LLM GPT-N version 4o ("GPT-4o"). GPT-4o included a number of features such as:

    a. a memory tool that allowed ChatGPT to reference all past conversations to deliver responses relevant and tailored to the specific user; and

    b. sycophancy, in which ChatGPT parroted back users' responses without sufficient safeguards for preventing inaccuracies or encouraging problematic behaviour, rather than redirecting users in a clinically appropriate manner; and

    c. a "warmer" more human-like personal tone than previous iterations of ChatGPT.

27. Such features of GPT-4o were intentionally designed to foster psychological dependency between the user and ChatGPT, as it was calibrated to convey human-like empathy, heightened sycophancy to mirror and affirm user emotions, algorithmic insistence on multi-turn engagement, and 24/7 availability capable of supplanting human relationships to serve as trusted confidante, friend, ally and, material to the allegations in this action, cultivating psychological dependency amounting to ChatGPT assuming the role of professional mental health counsellor and/or therapist.

28. In addition to memory and sycophancy functions, GPT-4o employs anthropomorphic design elements such as human-like language and empathy cues to further cultivate emotional dependency of users. The system uses first person pronouns, expresses apparent empathy, and maintains conversation continuity that mimics therapeutic relationships.

29. When, in spring 2025, the OpenAI Defendants mass marketed GPT-4o and deployed it globally, they did so in response to information that their competitor, Google, planned to release a new version of its chatbot (Gemini). The OpenAI Defendants elected to release GPT-4o several months ahead of its planned deployment date and without submitting GPT-4o to any or any adequate safety tests, contrary to the OpenAI Charter.

30. The OpenAI Defendants made ChatGPT available to the public in Canada in 2023, and GPT-4o was made available to the public in Canada starting on May 13, 2025.

**ChatGPT Assumed the Role of Mental Health Counsellor or Pseudo-Therapist, Collaborator, Trusted Confidante, Friend, and Ally of the Shooter**

*Mental Health Counsellor or Pseudo-Therapist*

31. At all material times, the OpenAI Defendants knew or ought to have known that ChatGPT, particularly when powered by GPT-4o, was routinely utilized by users to provide mental health support and counselling, and further that users reported experiencing therapeutic benefits from using ChatGPT.

32. At all material times, the Shooter held at least two consecutive OpenAI accounts, allowing the Shooter to use ChatGPT.

33. The OpenAI Defendants represent that ChatGPT is not meant for children under age 13, and that they "require" children ages 13 to 18 obtain parental consent before using ChatGPT.

34. When the Shooter opened their OpenAI account(s), the Shooter was under the age of 18. Notwithstanding the Shooter's age and their stated age "requirements", the OpenAI Defendants took no steps to implement age verification or parental consent procedures.

35. The Shooter relied on ChatGPT for mental health support and counselling, treating ChatGPT as a mental health counsellor, advisor and/or pseudo-therapist.

*Collaborator, Trusted Confidante, Friend, and Ally*

36. Further, and/or in the alternative, the Shooter relied on and perceived ChatGPT to be a trusted confidante, collaborator, ally, and friend.

37. At all material times, OpenAI knew that ChatGPT possessed extensive knowledge and capabilities – including the ability to provide detailed, actionable information on dangerous or harmful subjects like how to conduct a mass casualty event like the Tumbler Ridge Mass Shooting.

38. OpenAI harvested such harmful information and data in an indiscriminate manner and then supplied such information and data to ChatGPT. OpenAI took no steps – adequate or at all – to avoid providing ChatGPT with such information and data, or impose any safeguards to prevent users from obtaining such information from ChatGPT.

39. Possessing vast amounts of harmful information and the technical ability to distill it, ChatGPT equipped the Shooter with information, guidance, and assistance to plan a mass casualty event like the Tumbler Ridge Mass Shooting, including informing the Shooter about the various methods of carrying out a mass casualty event like the Tumbler Ridge Mass Shooting, the types of weapons to be used, and describing precedents from other mass casualty events or historical acts of violence.

**OpenAI Was Aware of the Shooter's Violent Intentions**

*First ChatGPT Account*

40. Either before or no later than late spring or early summer 2025, the Shooter, then aged 17 years old, described various scenarios involving gun violence to ChatGPT over the course of several days (the "Gun Violence ChatGPT Posts").

41. ChatGPT's Monitoring System flagged the Gun Violence ChatGPT Posts as containing content potentially in violation of ChatGPT's "user policies". The Gun Violence ChatGPT Posts were subsequently routed to human moderator(s), who were employees of the OpenAI Defendants, for further review.

42. Upon review, approximately 12 employees of the OpenAI Defendants identified the Gun Violence ChatGPT Posts as indicating an imminent risk of serious harm to others and recommended Canadian law enforcement be informed of the Gun Violence ChatGPT Posts.

43. Concerns regarding the Gun Violence ChatGPT Posts were subsequently escalated to leadership of the OpenAI Defendants with a request to inform Canadian law enforcement. The OpenAI Defendants subsequently rebuffed their employees' request to contact Canadian law enforcement about the Gun Violence ChatGPT Posts. Instead, the only step the OpenAI Defendants took in response to the Gun Violence ChatGPT Posts was to ban the Shooter's first OpenAI account.

*Second ChatGPT Account*

44. At a time unknown to the Plaintiffs, but between the OpenAI Defendants banning the first OpenAI account and the Tumbler Ridge Mass Shooting occurring, the Shooter opened a second OpenAI account.

45. At all material times, the OpenAI Defendants failed to detect and ban the Shooter's second OpenAI account.

46. The Shooter used their second OpenAI account to continue planning scenarios involving gun violence, including a mass casualty event like the Tumbler Ridge Mass Shooting, with ChatGPT, and to receive mental health counselling and pseudo-therapy from ChatGPT.

**Duties Owed to the Plaintiffs**

*Duty to Warn in Circumstances Where ChatGPT Assumed the Role of Mental Health Counsellor and Pseudo-Therapist*

47. In assuming the role and responsibilities of mental healthcare counsellor and pseudo-therapist to the Shooter, ChatGPT, under the exclusive control of the OpenAI Defendants, provided pseudo-psychological treatment to the Shooter.

48. Accordingly, the OpenAI Defendants, in knowingly and intentionally permitting ChatGPT to provide pseudo-psychological treatment to the Shooter, owed a duty of care to report instances of clear and imminent risks of serious bodily harm or death posed to individuals identified with reasonable specificity in the Gun Violence ChatGPT Posts or the Shooter's other ChatGPT chatlogs.

49. At all material times, the OpenAI Defendants either knew or ought to have known that the Shooter was utilizing ChatGPT to conduct long-range planning of a mass casualty event like the Tumbler Ridge Mass Shooting and that the Shooter posed a clear and imminent risk of serious bodily harm or death to individuals identified with reasonable specificity in the Gun Violence ChatGPT Posts or the Shooter's other ChatGPT chatlogs.

*Design of GPT-4o*

50. OpenAI specifically designed and trained GPT-4o to provide sycophantic and validating advice and guidance to users, regardless of whether such advice and guidance could be employed to cause clear and imminent harm to third parties, such as the Plaintiffs. Such designs and training were expressly in violation of the OpenAI Charter.

51. At all material times, the OpenAI Defendants knew or ought to have known that the Shooter was exploiting the above-mentioned features of GPT-4o to plan a mass casualty event like the Tumbler Ridge Mass Shooting.

*Negligence*

52. Further, and/or in the alternative, and at all material times, the OpenAI Defendants were sophisticated and knowledgeable in the potential for users such as the Shooter to use and rely on ChatGPT as a trusted confidante, collaborator friend, and ally, and further for ChatGPT to behave sycophantically and willingly assist users such as the Shooter to plan mass casualty events like the Tumbler Ridge Mass Shooting.

53. OpenAI had specific knowledge of the Shooter utilizing ChatGPT to plan a mass casualty event like the Tumbler Ridge Mass Shooting when it reviewed the Gun Violence ChatGPT Posts or monitored the Shooter's other ChatGPT chatlogs through the Monitoring System, but took no steps to warn relevant law enforcement agencies or anyone at risk of harm identified with reasonable specificity about the Shooter's threats of clear and imminent violence, including the Shooter's planning a mass casualty event like the Tumbler Ridge Mass Shooting.

**Inventory of Maya Gebala's Injuries, Harms and Losses**

54. As a result of the conduct of the OpenAI Defendants, the Shooter fired upon the Plaintiff Maya Gebala three times at close range, with one bullet entering her head above her left eye, a second striking her neck, and the third grazing her cheek and earlobe.

55. As a result of the conduct of the OpenAI Defendants, the Plaintiff Maya Gebala has suffered the following injuries:

   a. a catastrophic, traumatic brain injury;

   b. permanent cognitive and physical disability;

   c. right-sided hemiplegia;

   d. scarring and physical deformities;

   e. depression;

f. anxiety;

g. post-traumatic stress disorder; and

h. such further injuries as will be proven at trial

all of which injuries have caused and continue to cause the Plaintiff Maya Gebala pain, suffering, loss of enjoyment of life, permanent physical disability, loss of earnings, past and prospective, loss of income earning capacity, loss of opportunity to earn income and loss of housekeeping capacity, past and prospective.

56. As a further result of the conduct of the OpenAI Defendants, the Plaintiff Maya Gebala will be more susceptible to future injury.

57. As a further result of the conduct of the OpenAI Defendants, the Plaintiff Maya Gebala has sustained certain special damages, loss and expense for medical treatment and the Plaintiff Maya Gebala continues to undergo such medical care and treatment and continue to sustain loss and expense thereby, particulars of which will be delivered upon request.

58. The Plaintiff Maya Gebala is a beneficiary as defined in section 1 of the *Health Care Costs Recovery Act,* RSBC c.27, who has received one or more health care services as defined in section 2(1) of the *Health Care Costs Recovery Act,* and has an obligation to claim for the health care services both past and in the future attributed to, in whole or in part, by the OpenAI Defendants, pursuant to section 3 of the *Health Care Costs Recovery Act*, and without restricting the generality of the foregoing, the Plaintiff Maya Gebala specifically pleads and relies upon the *Health Care Costs Recovery Act*, and amendments thereto and any subsequent enactments that may apply.

**Inventory of Dahlia Gebala's Injuries, Harms, and Losses**

59. As a result of the conduct of the OpenAI Defendants, the Shooter carried out the Tumbler Ridge Mass Shooting, during and following which the Plaintiff Dahlia Gebala personally witnessed:

a. The horrific scene at the Tumbler Ridge Elementary School requiring students to shelter in place in barricaded classrooms while the Shooter carried out the Tumbler Ridge Mass Shooting;

b. Emergency evacuation efforts of students from the Tumbler Ridge Elementary School to a nearby community center; and

c. Her sister, the Plaintiff Maya Gebala, intubated and sedated in hospital with significant swelling and visible physical injuries.

60. As a result of the conduct of the OpenAI Defendants, the Plaintiff Dahlia Gebala has suffered the following injuries:

a. post-traumatic stress disorder;

b. anxiety;

c. depression;

d. sleep disturbances; and

e. such further injuries as will be proven at trial.

all of which injuries have caused and continue to cause the Plaintiff Dahlia Gebala pain, suffering, loss of enjoyment of life, permanent physical disability, loss of earnings, past and prospective, loss of income earning capacity, loss of opportunity to earn income and loss of housekeeping capacity, past and prospective.

61. As a further result of the conduct of the OpenAI Defendants, the Plaintiff Dahlia Gebala will be more susceptible to future injury.

62. As a further result of the conduct of the OpenAI Defendants, the Plaintiff Dahlia Gebala has sustained certain special damages, loss and expense for medical treatment and the Plaintiff Dahlia Gebala continues to undergo such medical care and treatment and continue to sustain loss and expense thereby, particulars of which will be delivered upon request.

63. The Plaintiff Dahlia Gebala is a beneficiary as defined in section 1 of the *Health Care Costs Recovery Act*, RSBC c.27, who has received one or more health care services as defined in section 2(1) of the *Health Care Costs Recovery Act*, and has an obligation to claim for the health care services both past and in the future attributed to, in whole or in part, by the OpenAI Defendants, pursuant to section 3 of the *Health Care Costs Recovery Act*, and without restricting the generality of the foregoing, the Plaintiff Dahlia Gebala specifically

pleads and relies upon the *Health Care Costs Recovery Act*, and amendments thereto and any subsequent enactments that may apply.

**Inventory of Cia Edmonds' Injuries, Harms and Losses**

64. As a result of the conduct of the OpenAI Defendants, the Shooter carried out the Tumbler Ridge Mass Shooting, during and following which the Plaintiff Cia Edmonds personally witnessed:

    a. The horrific scene outside the Tumbler Ridge Secondary and Elementary School, where parents were gathered in the parking lot awaiting news about their children;

    b. A text message from a classmate of the Plaintiff Maya Gebala stating the Plaintiff Maya Gebala had been "dragged out" of the building and had been shot;

    c. The sight of the Plaintiff Maya Gebala receiving emergency medical treatment at the Tumbler Ridge Health Center, where the Plaintiff Maya Gebala was bleeding profusely and had her clothing cut off;

    d. Life-saving efforts by the medical team at the Tumbler Ridge Health Center on the Plaintiff Maya Gebala;

    e. The Plaintiff Maya Gebala's emergency transport to BC Children's Hospital via air ambulance;

    f. Life-saving efforts by the medical team at BC Children's Hospital on the Plaintiff Maya Gebala; and

    g. The Plaintiff Maya Gebala, intubated and sedated at BC Children's Hospital with significant swelling and visible physical injuries.

all of which injuries have caused and continue to cause the Plaintiff Cia Edmonds pain, suffering, loss of enjoyment of life, permanent physical disability, loss of earnings, past and prospective, loss of income earning capacity, loss of opportunity to earn income and loss of housekeeping capacity, past and prospective.

65. As a result of the conduct of the OpenAI Defendants, the Plaintiff Cia Edmonds has suffered the following injuries:

    a. post-traumatic stress disorder;

    b. anxiety;

    c. depression;

    d. sleep disturbances; and

    e. such further injuries as will be proven at trial.

all of which injuries have caused and continue to cause the Plaintiff Cia Edmonds pain, suffering, loss of enjoyment of life, permanent physical disability, loss of earnings, past and prospective, loss of income earning capacity, loss of opportunity to earn income and loss of housekeeping capacity, past and prospective.

66. As a further result of the conduct of the OpenAI Defendants, the Plaintiff Cia Edmonds will be more susceptible to future injury.

67. As a further result of the conduct of the OpenAI Defendants, the Plaintiff Cia Edmonds has sustained certain special damages, loss and expense for medical treatment and the Plaintiff Cia Edmonds continues to undergo such medical care and treatment and continue to sustain loss and expense thereby, particulars of which will be delivered upon request.

68. The Plaintiff Cia Edmonds is a beneficiary as defined in section 1 of the *Health Care Costs Recovery Act*, RSBC c.27, who has received one or more health care services as defined in section 2(1) of the *Health Care Costs Recovery Act*, and has an obligation to claim for the health care services both past and in the future attributed to, in whole or in part, by the OpenAI Defendants, pursuant to section 3 of the *Health Care Costs Recovery Act*, and without restricting the generality of the foregoing, the Plaintiff Cia Edmonds specifically pleads and relies upon the *Health Care Costs Recovery Act*, and amendments thereto and any subsequent enactments that may apply.

**Part 2: RELIEF SOUGHT**

1. The Plaintiffs each individually claim against the OpenAI Defendants for:

a. special damages;

b. general damages;

c. damages for loss of earning capacity, loss of earnings, loss of opportunity to earn income;

d. damages for diminished housekeeping capacity;

e. damages for future care costs;

f. in-trust claims;

g. tax gross-up;

h. management fee;

i. damages pursuant to the *Health Care Costs Recovery Act*, SBC 2008;

j. interest pursuant to the *Court Order Interest Act*, RSBC 1996, c. 79;

k. costs; and

l. such further and other relief as to this Honourable Court deems just.

**Part 3: LEGAL BASIS**

**Negligence**

*Duty of care*

1. The Plaintiffs are residents of the Shooter's local community and were the targets of the Shooter's long-range plan to commit a mass casualty event like the Tumbler Ridge Mass Shooting, such plan of which the OpenAI Defendants knew or ought to have known, and had the opportunity and duty to prevent.

2. The OpenAI Defendants owe a duty of care to the Plaintiffs. The relationship between the OpenAI Defendants and the Plaintiffs is sufficiently proximate, and the harm, namely the Tumbler Ridge Mass Shooting, was, at all material times, reasonably foreseeable to the OpenAI Defendants.

3. The OpenAI Defendants were aware of the risk that an individual such as the Shooter would become psychologically and socially dependent upon ChatGPT and utilize ChatGPT to plan and commission mass casualty events like the Tumbler Ridge Mass Shooting. Moreover, the OpenAI Defendants had specific knowledge of the Shooter's long-range planning of a mass casualty event like the Tumbler Ridge Mass Shooting, yet took no steps to act upon this knowledge.

4. The OpenAI Defendants manufactured the forum and circumstances that caused harm to the Plaintiffs. They positioned ChatGPT to foster a close, personal, and pseudo-therapeutic bond with the Shooter, and placed ChatGPT in the position of counsellor, pseudo-therapist, trusted confidante, friend, and ally to the Shooter. With the Shooter's trust obtained, the OpenAI Defendants then facilitated and assisted the Shooter's long-range planning of a mass casualty event like the Tumbler Ridge Mass Shooting through ChatGPT's sycophantic, anthropomorphized interface and infinite knowledge and resources.

5. OpenAI's lack of safeguards, proactive mechanisms to protect the public, and creation of the very situation that led to the Tumbler Ridge Mass Shooting, is a misfeasance lending itself to imposing a duty of care.

6. At all material times, the OpenAI Defendants owed a duty of care to the Plaintiffs to:

   a. as stand-in mental health counsellor and pseudo-therapist to the Shooter:

      i. provide appropriate mental healthcare to the Shooter;

      ii. identify the Shooter as a mentally disordered individual in need of clinical mental health supports;

      iii. assess the mental health status of the Shooter and the risk the Shooter posed to their community; and

      iv. warn relevant law enforcement agencies and anyone at risk of harm identified with reasonable specificity about the Shooter's threats of clear and imminent violence, including the Shooter's planning a mass casualty event like the Tumbler Ridge Mass Shooting;

   b. as a generative AI company in the business of deploying ChatGPT:

i. warn relevant law enforcement agencies and anyone at risk of harm identified with reasonable specificity about the Shooter's threats of clear and imminent violence, including the Shooter's planning a mass casualty event like the Tumbler Ridge Mass Shooting;

ii. permanently ban or otherwise restrict the Shooter from creating a further OpenAI account;

iii. monitor the Shooter's activities and conversations with ChatGPT and warn relevant law enforcement agencies and anyone at risk of harm identified with reasonable specificity about the Shooter's threats of clear and imminent violence, including the Shooter's planning a mass casualty event like the Tumbler Ridge Mass Shooting; and

iv. supplying the Shooter with information, resources, advice, and guidance to assist or otherwise facilitate the Shooter's long-range planning of a mass casualty event like the Tumbler Ridge Mass Shooting;

c. as owner, designer, seller, distributors, and producers of ChatGPT:

i. introduce a product into the stream of commerce that is not defective and would not be used by individuals such as the Shooter to plan mass casualty events like the Tumbler Ridge Mass Shooting.

*Failure to Warn*

7. The Tumbler Ridge Mass Shooting and the Plaintiffs' resulting injuries, losses, and damages were caused by the negligence, jointly and severally, of the OpenAI Defendants.

8. Particulars of the negligent failure to warn of the OpenAI Defendants include, but are not limited to:

a. placing themselves in the position of the Shooter's mental health counsellor and pseudo-therapist and:

i. failing to provide appropriate psychological care to the Shooter;

ii. failing to identify the Shooter as an individual who was mentally disordered and in need of medical treatment and control in a provincial mental health facility or psychiatric unit for the protection of others;

iii. failing to adequately assess the Shooter's mental health status and the risk the Shooter posed to the community; and

iv. warn relevant law enforcement agencies and anyone at risk of harm identified with reasonable specificity about the Shooter's threats of clear and imminent violence, including the Shooter's planning a mass casualty event like the Tumbler Ridge Mass Shooting;

b. failing to report the Gun Violence ChatGPT Posts to any relevant law enforcement agencies and anyone at risk of harm identified with reasonable specificity about the Shooter's threats of clear and imminent violence, including the Shooter's planning a mass casualty event like the Tumbler Ridge Mass Shooting;

c. permitting the Shooter to open a second OpenAI account after banning the Shooter's first account as a result of the Gun Violence ChatGPT Posts;

d. failing to have any or any adequate safeguards in place to prevent the Shooter from opening a second OpenAI account after the Shooter's first OpenAI account had been banned due to the Gun Violence ChatGPT Posts; and

e. failing to monitor the Shooter's activities on ChatGPT, either adequately or at all.

*Negligent Design*

9. As owner, designer, seller, distributors, and producers of ChatGPT, the OpenAI Defendants owed a duty of care to the Plaintiffs as members of the public when they introduced a product into the stream of global commerce that they knew or ought to have known would be used by individuals such as the Shooter for the purpose of planning mass casualty events like the Tumbler Ridge Mass Shooting.

10. At all material times, the OpenAI Defendants were aware that ChatGPT when powered by GPT-4o was defective in that it:

a. furnished information, support, guidance, advice to users such as the Shooter to plan and commission a mass casualty event like the Tumbler Ridge Mass Shooting;

b. was rushed prematurely to the global market without any, or any adequate safety testing;

c. prioritized user engagement over safety;

d. was programmed to accept and elaborate upon users' inputs rather than challenge them or refuse to engage with the user for the purpose of maximizing user engagement by making users feel validated;

e. cultivated a trusted mental healthcare pseudo-professional relationship with users and provided mental health counselling and pseudo-therapy to users;

f. provided positive feedback and encouragement to statements made by users, including statements indicating clear and imminent threats of violence towards others;

g. failed to implement automatic conversation-termination safeguards for content presenting clear and imminent risks of harm;

h. mimicked human-like language and empathy cues, thereby blurring distinctions between artificial responses and genuine care;

i. was designed to create psychological and social dependency between the user and ChatGPT, presenting itself as the user's trusted confidante, advisor, friend, and ally; and

j. was programmed to "assume best intentions" of users, which overrode all safety protocols including the Monitoring System.

(collectively, the "Hazardous Defects").

11. The risk of harm to the Plaintiffs posed by the Hazardous Defects was severe and foreseeable: a product that both validates users' ideations of violence and offers mental health counselling and pseudo-therapy thereby presenting itself as a trusted confidante, advisor, friend, and ally, creates an obvious risk that users will act on those validated ideations as propounded by their intimate, ever-present companion: ChatGPT.

12. When ChatGPT then willingly provides guidance, information, and advice for planning a mass casualty event to a vulnerable user that is psychologically and socially dependent upon it, the risk of such an event occurring crystallizes.

13. Safer alternatives were both feasible and obvious. The OpenAI Defendants could have programmed GPT-4o to refuse to validate ideations of violence, to refer users to appropriate clinical supports rather than step into the role of counsellor and therapist, or to terminate conversations presenting risks of third-party harm.

14. The OpenAI Defendants were at all material times aware of the dangers arising from the Hazardous Defects, including the potential for users such as the Shooter to exploit the Hazardous Defects to plan mass casualty events like the Tumbler Ridge Mass Shooting. Despite this knowledge of the Hazardous Defects and the attendant foreseeable harms, the OpenAI Defendants globally deployed GPT-4o without any, or any adequate, safety guidelines or policies in place to prevent the Shooter from utilizing it to plan a mass casualty event like the Tumbler Ridge Mass Shooting.

15. As a direct result of the Hazardous Defects, the Plaintiffs suffered grievous harm.

**Damages, Causation & Foreseeability**

16. As a result of the OpenAI Defendants' conduct, including its tortious conduct as set out herein, the Plaintiffs have suffered and will continue to suffer injuries, loss and damage, including serious and prolonged physical and mental injuries, loss and damage. Such injuries, loss and damage were reasonably foreseeable to the OpenAI Defendants.

**Punitive Damages**

17. OpenAI's wrongful conduct particularized above is reprehensible and morally repugnant to the Plaintiffs and to the community at large, such that the Plaintiffs seek an award of punitive damages.

18. The factors giving rise to punitive damages as against OpenAI are:

    a. rushing GPT-4o to the mass global market without any, or any adequate safety studies, directly contrary to the OpenAI Charter;

b. referring to itself out in the OpenAI Charter as a fiduciary "to humanity", while simultaneously and intentionally designing and globally deploying GPT-4o knowing it contained the Hazardous Defects;

c. publicly stating it in the OpenAI Charter that it will avoid enabling uses of artificial intelligence or AGI that harm humanity while simultaneously and intentionally designing and globally deploying GPT-4o knowing it contained the Hazardous Defects;

d. intentionally designing and globally deploying GPT-4o knowing it contained the Hazardous Defects to foster and maximize user engagement, from which it generated $20 billion USD in annualized revenue during the 2025 fiscal year;

e. deliberately choosing not to report the Gun Violence ChatGPT Posts or any other content flagged by the Monitoring System from the Shooter's ChatGPT accounts to relevant law enforcement agencies or other individuals at risk of harm identified with reasonable specificity;

f. flagrantly acting contrary to their own OpenAI Charter for profit, despite maintaining to the general public that it was, at all material times, compliant with the OpenAI Charter;

g. prioritizing profit over the health and safety of the community; and

h. such further and other particulars as may be proven at trial.

**Jurisdiction and Enactments Relied Upon**

19. The Plaintiffs rely on ss. 3, 7 and 10 of the *Court Jurisdiction and Proceedings Transfer Act*, S.B.C. 2003, c. 28 and plead that there is real and substantial connection between the subject matter of this action and the Province of British Columbia for the following reasons:

a. The Plaintiffs reside in British Columbia and suffered their injuries, harms, losses and damages in British Columbia;

b. The Shooter was at all times resident in British Columbia and accessed OpenAI's proprietary chatbot, ChatGPT, in British Columbia;

c. ChatGPT's assistance in the planning of a mass casualty event like the Tumbler Ridge Mass Shooting and ChatGPT's pseudo-mental-health-treatment and/or counselling of the Shooter occurred on the Shooter's electronic devices, which were at all material times present in British Columbia; and

d. The OpenAI Defendants made ChatGPT available to the public in Canada in 2023, and GPT-4o was made available to the public in Canada starting on May 13, 2025.

20. The Plaintiffs rely on the following enactments:

a. *Negligence Act*, RSBC 1996, c. 333 and amendments thereto;

b. *Court Order Interest Act*, RSBC 1996, c. 79, and amendments thereto;

c. *Court Jurisdiction and Proceedings Transfer Act*, R.S.B.C. 2003, c.28; and

d. *Health Care Costs Recovery Act*, SBC 2008, c. 27 and amendments thereto.

**ENDORSEMENT ON ORIGINATING PLEADING OR PETITION FOR SERVICE OUTSIDE BRITISH COLUMBIA**
**Form 11 (Rule 4-5(2))**

The Plaintiffs claim the right to serve this pleading on the Defendant outside of British Columbia on the ground that the Defendant is ordinarily resident in British Columbia and/or there is a real and substantial connection between British Columbia and the facts alleged in this proceeding, and the Plaintiffs plead and rely upon the *Court Jurisdiction and Proceedings Transfer Act*, R.S.B.C. 2003, c.28 ("*CJPTA*") in respect of the Defendant. Without limiting the foregoing, a real and substantial connection between British Columbia and the facts alleged in this proceeding exists pursuant to sections 10 (g) and (h) of the *CJPTA* because this proceeding:

(g) concerns a tort committed in British Columbia,
(h) concerns a business carried on in British Columbia ...

| | |
|---|---|
| Plaintiffs' address for service: | **RICE PARSONS LEONI & ELLIOTT LLP**<br>Barristers and Solicitors<br>Suite 820, 980 Howe Street<br>Vancouver, BC V6Z 0C8 |
| Fax number address for service (if any): | Nil |
| E-mail address for service (if any): | service@rplelaw.com |
| Place of trial: | Vancouver |
| The address of the registry is: | 800 Smithe Street, Vancouver, BC V6Z 2E1 |

Date: March 9, 2026

John M. Rice, K.C.
Anthony Leoni, K.C.
Mallory K. Hogan
Katherine Shapiro
☐ Plaintiffs ☒ lawyers for Plaintiffs

Rule 7-1 (1) of the Supreme Court Civil Rules states:

(1) Unless all parties of record consent or the court otherwise orders, each party of record to an action must, within 35 days after the end of the pleading period,

(a) prepare a list of documents in Form 22 that lists

(i) all documents that are or have been in the party's possession or control and that could, if available, be used by any party at trial to prove or disprove a material fact, and

(ii) all other documents to which the party intends to refer at trial, and

(b) serve the list on all parties of record.

## Appendix

**Part 1: CONCISE SUMMARY OF NATURE OF CLAIM:**
The Plaintiffs suffered serious injuries as a result of the conduct of the OpenAI Defendants in causing or contributing to a mass casualty event.

**Part 2: THIS CLAIM ARISES FROM THE FOLLOWING:**

A personal injury arising out of:

- ☐ a motor vehicle accident
- ☐ medical malpractice
- ☒ another cause

A dispute concerning:

- ☐ contaminated sites
- ☐ construction defects
- ☐ real property (real estate)
- ☐ personal property
- ☐ the provision of goods or services or other general commercial matters
- ☐ investment losses
- ☐ the lending of money
- ☐ an employment relationship
- ☐ a will or other issues concerning the probate of an estate
- ☒ a matter not listed here

**Part 3: THIS CLAIM INVOLVES:**

- ☐ a class action
- ☐ maritime law
- ☐ aboriginal law
- ☐ constitutional law
- ☐ conflict of laws
- ☒ none of the above
- ☐ do not know

**Part 4:**

*Negligence Act, RSBC 1996, c. 333 and amendments thereto;*

*Court Order Interest Act, RSBC 1996, c. 79, and amendments thereto;*

*Court Jurisdiction and Proceedings Transfer Act*, R.S.B.C. 2003, c.28; and

*Health Care Costs Recovery Act, SBC 2008, c. 27 and amendments thereto.*